UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

RENE BONILLA,

                       Petitioner,          13 Civ. 3725 (JGK)

       - against -          OPINION AND ORDER

SUPERINTENDENT WILLIAM LEE,

                   Respondent.
————————————————————————

JOHN G. KOELTL, District Judge:

    Rene Bonilla brings this pro se petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254.  Following a jury
trial, the petitioner was convicted in the New York State
Supreme Court, Bronx County of one count of murder in the second
degree in violation of New York Penal Law § 125.25(1) and one
count of attempted murder in the second degree in violation of
New York Penal Law §§ 110.00 and 125.25(1).  The petitioner was
sentenced to consecutive terms of imprisonment of twenty-five
years to life and twenty-five years.  The judgment of conviction
was affirmed on December 30, 2008 by the Appellate Division,
First Department, 870 N.Y.S.2d 18 (App. Div. 2008), and leave to
appeal to the Court of Appeals was denied on April 24, 2009.
908 N.E.2d 929 (N.Y. 2009).  The petitioner subsequently filed
two motions to vacate his conviction pursuant to New York
Criminal Procedure Law § 440.10 in the trial court, and one
motion for a writ of error coram nobis in the Appellate

Division, First Department.  All of these applications were denied and leave to appeal was denied.

In the present habeas petition, dated May 23, 2013, the petitioner claims that the trial court erred in failing to charge the jury with instructions on the justification defense, the affirmative defense of extreme emotional disturbance, and the lesser-included offense of manslaughter in the first degree. He also challenges the trial court's imposition of consecutive sentences, and he alleges that his sentence should be reduced as excessive in the interest of justice.  Finally, the petitioner brings various claims for denial of the effective assistance of counsel during the pretrial proceedings.  For the reasons explained below, the petition for a writ of habeas corpus is denied.

I.

A.

The petitioner was indicted by grand jury on September 8, 2005.  The Indictment charged him with murder in the second degree (Count One), murder in the second degree based on depraved indifference (Count Two), attempted murder in the second degree (Count Three), and criminal possession of a weapon in the second degree (Count Four).  On May 11, 2007 a jury found the petitioner guilty of murder in the second degree and

2

attempted murder in the second degree.  (See Trial Tr. ("Tr.")
at 689-91.)  On October 29, 2007, Justice Dominic Massaro
sentenced the petitioner to consecutive prison terms of twenty-
five years to life and twenty-five years for the murder and
attempted murder convictions, respectively.  964 N.Y.S.2d 61, at
*1 (Sup. Ct. 2012).[1]


                              B.

     The events leading to the petitioner's conviction took
place in the summer of 2005.  Testimony at trial indicated that
the petitioner and Leonardo De'Aza had been long-time friends,
(Tr. at 101, 271, 467), but that in approximately July 2005,
their relationship deteriorated after De'Aza's uncle, Fernando,
told De'Aza that the petitioner had robbed Fernando.  (Tr. at
273; see also Tr. at 103-04.)

     At trial, De'Aza and the petitioner both testified that
they had altercations in the weeks that followed.  De'Aza
testified that the first altercation began when De'Aza
approached the petitioner and the petitioner's pregnant
girlfriend in the street and asked the petitioner why he had

---

[1] The petitioner was originally sentenced to two consecutive
terms of twenty-five years to life, (See Sentence Tr. at 18-19),
but this sentence was modified on October 29, 2007 to
consecutive terms of twenty-five years to life and twenty-five
years.  See 964 N.Y.S.2d at *1.

robbed his uncle.  (Tr. at 274-75.)  According to De'Aza, the petitioner then threw a punch at De'Aza, a fistfight ensued, and De'Aza eventually knocked the petitioner out.  (Tr. at 276.) The petitioner confirmed that this altercation had occurred, but he testified that De'Aza threw the first punch.  (Tr. at 471.) No weapons were used during the fight.  (Tr. at 276; see also Tr. at 470-71.)

According to the petitioner, two other altercations followed this initial encounter.[2]  First, a few days after the fistfight, De'Aza and a few of his associates approached the petitioner as he was riding his bicycle, knocked him off of it, beat him up, and stole the bicycle.  (Tr. at 471-73.)  One of the individuals had a knife.  (Tr. at 473.)  Then, a few days later, a group of De'Aza's associates attacked the petitioner and beat him up.  (Tr. at 473-75.)  De'Aza was not present during this last attack.  (Tr. at 474.)


C.

On September 5, 2005, the petitioner was staying in an apartment in a building at 526 East 138th Street in the Bronx. (Tr. at 476; see also Tr. at 373.)  The petitioner testified that at some point between 4:00 and 5:00pm, the petitioner's

---

[2] De'Aza's testimony does not mention any altercations between the fistfight and the day of the shooting.  (See Tr. at 278.)

4

girlfriend called him and informed him that De'Aza was "looking for [him] with a gun and he wanted to kill [him]."  (Tr. at 478.)  She also said that De'Aza and two associates had come to her house looking for the petitioner.  (Tr. at 478-79.)

The petitioner further testified that at some point later in the day he received two additional phone calls regarding De'Aza.  During the second call, an unidentified individual informed the petitioner that "it was going around that [De'Aza] was looking for [him]."  (Tr. at 480.)  During the third call, a different individual told the petitioner that if De'Aza and his associates could not find the petitioner, they would attack his pregnant girlfriend.  (Tr. at 480-81.)

The petitioner testified that after he received the third call, he "lost [his] head."  (Tr. at 481.)  He then proceeded to the apartment at 526 East 138th Street, retrieved a .380 caliber handgun, and went to his girlfriend's house to retrieve a hooded sweatshirt.  (Tr. at 482-83.)  At his girlfriend's house, the petitioner told his girlfriend that he "was going to fix things with [De'Aza] because everything was a misunderstanding . . . [and he] did not rob nobody."  (Tr. at 484.)

D.

The petitioner testified that he then left his girlfriend's house looking for De'Aza, and ultimately found him at Saw Mill

5

Park.  (See Tr. at 484.)  De'Aza was "with two of his friends on
the side of a car."  (Tr. at 485.)  The petitioner was wearing
the hooded sweatshirt with the hood over his head and the gun
concealed in the front pocket.  (Tr. at 486.)

According to the petitioner, as the petitioner approached
De'Aza from across the street, De'Aza appeared to reach for
something at his waist, which the petitioner thought was a gun.
(Tr. at 486-88.)  At this point the petitioner was "between a
van and a car."  (Tr. at 488.)  When the petitioner perceived
De'Aza reaching for something, he shot at De'Aza twice.  (Tr. at
488; see also Tr. at 510-11.)

The petitioner testified that he had no memory of what
happened next because he "blanked out" after the first two
shots.  (Tr. at 488-89.)


                              E.

In addition to the petitioner, four witnesses who were at
or near Saw Mill Park at the time of the shooting testified at
the petitioner's trial.  De'Aza's mother, Sonia Alvarez, was in
her home across the street from the park on September 5, 2005
when, at approximately 8:45 or 8:50pm, she heard two gunshots,
then a pause, and then an array of additional gunshots.  (Tr. at
107-08.)  She then heard people yelling from outside her house
that her son had been shot.  (Tr. at 109.)  She ran to the park

                               6

across the street and found her son, who was lying on the
ground, injured but conscious, with people trying to put
pressure on his wounds.  (Tr. at 111.)  She testified that
De'Aza told her the petitioner had shot him, and that Naiesha
Pearson had also been hit.  (Tr. at 111.)  Shortly thereafter
De'Aza was transported away from the scene in an ambulance.
(Tr. at 112.)

F.

Taisha Pearson was also at the park at the time of the
shooting.  She testified that shortly before the first shots
were fired, De'Aza was helping to fix her daughter Naiesha
Pearson's bicycle on the sidewalk by his parked car.  (Tr. at
145, 147-48.)  At 8:45pm, Taisha heard two gunshots.  (Tr. at
149.)  She then picked up her three-and-a-half-month-old
daughter and ran to Naiesha, whom she observed leaning on a car.
(Tr. at 149, 152.)  Taisha saw a man in a hooded sweatshirt
standing in the middle of the street, which she thought was
unusual given the warm weather.  (See Tr. at 150-51.)  When
Taisha got to Naiesha, she saw the man in the sweatshirt
standing over De'Aza shooting at him.  (Tr. at 154-55.)  The man
fired about four shots at De'Aza from that position.  (Tr. at
156.)  Taisha lifted up Naiesha's shirt and saw that she had
been shot in her chest.  (Tr. at 157.)  Eventually two police

7

officers arrived and transported Taisha with her daughter to
Lincoln Hospital.  (Tr. at 158.)


                              G.

     De'Aza's aunt, Hilda Alvarez, was also at the park at the
time of the shooting.  She testified that at approximately
8:45pm on September 5, De'Aza was on the sidewalk by his car
helping Naiesha Pearson fix her bicycle.  (Tr. at 170, 173.)
Hilda was roughly twelve feet from De'Aza when she saw the
petitioner[3] run through a gap between two parked cars wearing a
hooded sweatshirt, "put his hand in his pocket, and start[]
firing."  (Tr. at 173-74, 176; see also Tr. at 178.)  She then
observed De'Aza attempt to push Naiesha away from him, but
Naiesha was clutching his leg.  (Tr. at 174.)  When Naiesha
fell, De'Aza attempted to coax the petitioner away from the
children who were playing nearby.  (Tr. at 175.)  De'Aza then
fell to the ground, and the petitioner stood over him and fired
more shots at him.  (See Tr. at 175-76.)  Hilda heard the
petitioner fire five shots before she saw him flee in the
direction of the apartment on East 138th Street.  (See Tr. at
176-77.)  She saw a large crowd chase after the petitioner, but

_____

[3] Hilda Alvarez testified that she was certain the man she saw
firing at De'Aza was the petitioner because she made eye contact
with him before he started firing, and she had known him for
seventeen years.  (See Tr. at 173-74, 178.)

                              8

she stayed on the scene until an ambulance took De'Aza away.
(See Tr. at 179-80.)


                              H.

     Elaine Cintron, Naiesha Pearson's aunt and a friend of
De'Aza, was also at the park during the shooting.  She testified
that she heard a "pop," and then saw a man in a black hood
standing in the street, emerging from between two vehicles
parked on the street.  (Tr. at 204-05.)  Cintron saw the man
fire two more shots at De'Aza, and then De'Aza went down.  (See
Tr. at 206-07.)  At this point she saw Naiesha's mother run to
Naiesha, and then she saw the shooter stand over De'Aza and fire
four more times.  (Tr. at 208-09.)  The shooter then ran from
the scene.  (Tr. at 209.)  Cintron approached De'Aza, who was
repeating the words, "Rene did it."  (Tr. at 212.)  When police
officers arrived, Cintron got in the police car with Taisha and
Naiesha Pearson and went with them to Lincoln Hospital.  (Tr. at
214.)


                              I.

     Finally, De'Aza testified that he was fixing Naiesha's
bicycle when he heard two people shouting, "Rene watch it, Rene,
Rene."  (Tr. at 283.)  De'Aza then heard shots come from behind him,
looked back and saw the petitioner standing in the street,

                              9

attempted to grab Naiesha to cover her, and was hit with two
shots in the back.  (Tr. at 283.)  De'Aza attempted to throw
Naiesha off of him and was hit again in the side and fell to the
ground.  (Tr. at 283.)  The petitioner then "came on top of
[him]," fired two more shots, and then attempted to fire a final
shot at De'Aza's face, which De'Aza blocked with his hand.  (See
Tr. at 289-90.)  De'Aza testified that the petitioner shot him
five times and only stopped firing when his gun jammed.  (Tr. at
290.)  At some point while standing over De'Aza, the petitioner
said, "I got you now."  (Tr. at 289.)  De'Aza responded, "Do
it," and the petitioner shot him again.  (Tr. at 289.)  De'Aza
thought he was dead.  (Tr. at 290.)  According to De'Aza's
testimony, De'Aza had nothing in his hand during the shooting.
(Tr. at 344.)


                              J.

     De'Aza was hit by a total of five bullets.  (Tr. at 286,
290.)  He spent one to two weeks in the hospital receiving
treatment, and at the time of trial he was still experiencing
back pain and stomach pain, and had difficulty eating and
drinking.  (Tr. at 293.)

     Naiesha Pearson was pronounced dead at Lincoln Hospital
approximately forty-five minutes after she arrived there on the

                              10

night of the shooting.  (See Tr. at 158.)  The cause of death
was a gunshot wound to her chest.  (Tr. at 359.)

### K.

The petitioner testified that he recalled eventually
returning to the apartment at 526 138th Street after the
shooting, where his girlfriend met him.  (See Tr. at 489-92.)
The girlfriend informed the petitioner that De'Aza had been shot
and that a child had been killed.  (Tr. at 492.)

After some time, people surrounded the building and started
knocking on the door of the apartment.  (Tr. at 492.)  The
petitioner fled the apartment onto the fire escape and was hit
by a bottle and fell to the ground.  (Tr. at 493.)

### L.

Detective Peter Tarsnane of the New York City Police
Department testified that he was dispatched to the scene of the
shooting on the night of September 5, 2005 and arrived there at
approximately 9:30 or 9:45pm.  (Tr. at 223-24.)  When he
arrived, "[t]here was hundreds of people out on the street,
people running everywhere.  There was a lot of yelling and
screaming. . . .  [I]t was pandemonium . . . ."  (Tr. at 225.)

Detective Denis O'Sullivan was also dispatched to the scene
that evening.  (Tr. at 367.)  When O'Sullivan arrived, De'Aza

was still on the sidewalk lying face up on the ground, but O'Sullivan was unable to approach him because there were too many people around.  (Tr. at 368.)

Later that night, O'Sullivan received an anonymous call that the petitioner was at 526 East 138th Street.  (Tr. at 373.) At approximately 2:00am, Tarsnane and O'Sullivan both went to that address.  (See Tr. at 227-28, 373.)  O'Sullivan testified that the building at 526 East 138th Street was surrounded by a large group of people and several police officers who were attempting to secure the area.  (Tr. at 374.)  Tarsnane went through the building and out the back door and saw the petitioner lying on the ground in the back.  (Tr. at 230-31.) O'Sullivan also found the petitioner lying in the backyard of the building.  (Tr. at 374-76.)  Tarsnane handcuffed the petitioner, and officers escorted him to a police car.  (Tr. at 232.)  The petitioner was then taken to the Detective Bureau at 1086 Simpson Street, where he was placed in a cell.  (Tr. at 233-34, 376-78.)

Tarsnane and O'Sullivan both testified that the petitioner did not appear to be injured at the time of the arrest.  (Tr. at 231, 376.)  However, after arriving at the station, the petitioner complained of back pain, and the officers called for an ambulance to take him to the hospital.  (See Tr. at 235, 378-79.)  While they were waiting for the ambulance, O'Sullivan gave

the petitioner a <u>Miranda</u> warning and the detectives then questioned the petitioner about the shooting.  (Tr. at 237-46, 379-82.)  After answering some questions, the petitioner agreed to give a statement, which Tarsnane recorded by hand.  (Tr. at 244-45; <u>see also</u> Resp't's Opp'n, Ex. 22.)

After the petitioner gave his statement, the ambulance arrived and took him to Jacobi Hospital.  (Tr. at 250-51, 382.) Approximately twelve hours later, O'Sullivan visited the petitioner in the hospital with Assistant District Attorney ("ADA") Jeremy Shockett and another detective, (Tr. at 384), and ADA Shockett interviewed the petitioner about the shooting. (Tr. 385-86; <u>see also</u> Resp't's Opp'n, Ex. 23.)  Shockett gave the petitioner a <u>Miranda</u> warning and the interview was recorded. (Resp't's Opp'n, Ex. 23 at 1-3; Tr. at 385.)


M.

On September 8, 2005, the petitioner was indicted by grand jury.  On April 20, 2006, the petitioner filed a motion to dismiss the Indictment and to suppress the statements made by the petitioner following his arrest.  (<u>See</u> Resp't's Opp'n, Ex. 21.)  Following a <u>Huntley</u>/<u>Dunaway</u> hearing, Justice Michael Gross denied the petitioner's motions.  (<u>See</u> Apr. 26, 2007 Hr'g Tr.

("Hr'g") at 73-84.)[4]   Detective Tarsnane's transcription of the statement given by the petitioner at the Simpson Street Detective Bureau was entered into evidence and read for the jury during trial.  (Tr. at 246-50.)   An audio recording of ADA Shockett's interview of the petitioner was also entered into evidence and played for the jury during trial.   (Tr. at 391-93.)

### N.

Jury selection began on April 30, 2007, and trial began on May 2, 2007.  After both parties had rested, the court denied defense counsel's request for a charge on the defense of justification, the affirmative defense of extreme emotional disturbance, and the lesser-included offense of manslaughter in the first degree.  (See Tr. at 569-70.)   Counts Two and Four of the Indictment—charging depraved indifference murder and criminal possession of a weapon, respectively—were stricken, and the jury was charged on Counts One and Three—murder in the second degree and attempted murder in the second degree.   (See Tr. at 573-74, 659-66.)   With respect to Count One, the court

---

[4] The hearing transcript is included in "Exhibit 6" to the present habeas corpus petition, and in "Exhibit 3" to the petitioner's reply brief.  The transcript provided by the petitioner is missing pages 51-54, but it is evident from context and from the legal standards applicable to the petitioner's claims that this omission has no bearing on any issues in his habeas petition.

gave a transferred intent charge, 870 N.Y.S.2d at 20, explaining that the jury could convict if it found that the petitioner caused the death of Naiesha Pearson with the intent to cause the death of De'Aza.  (See Tr. at 661.)

On May 10, 2007, the jury returned a verdict of guilty on both counts.  (See Tr. at 689-91.)  Judgment was entered on June 14, 2007, and amended on October 29, 2007.  870 N.Y.S.2d at 19. The petitioner was ultimately sentenced to consecutive terms of twenty-five years to life and twenty-five years.  Id.  The petitioner appealed, and his conviction was affirmed by the Appellate Division, First Department on December 30, 2008.  See id.  Leave to appeal to the New York Court of Appeals was denied on April 24, 2009.  908 N.E.2d 929.  The petitioner then brought various applications for post-conviction relief in state court, including two motions to vacate his judgment pursuant to New York Criminal Procedure Law § 440.10 in the trial court, and a motion for a writ of error coram nobis in the Appellate Division, First Department.  All of these applications were denied.  (Resp't's Opp'n, Exs. 10-11, 14-15, 18-20.)

The present petition pursuant to 28 U.S.C. § 2254 was signed on May 23, 2013 and received by the Court on May 30, 2013.

II.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); see also Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006); Sookoo v. Heath, No. 09cv9820, 2011 WL 1542543, at *3 (S.D.N.Y. Apr. 21, 2011).

A state court decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result. Williams v. Taylor, 529 U.S. 362, 405 (2000); Sookoo, 2011 WL 1542543, at *3.

A state court decision is "an unreasonable application of . . . clearly established Federal law" if the state court "correctly identifies the governing legal rule but applies it

16

unreasonably to the facts of a particular prisoner's case."
Williams, 529 U.S. at 407-08.  To meet that standard, "the state
court decision must be more than incorrect or erroneous[,] . . .
it must be objectively unreasonable."  Jones v. Walsh, No.
06cv225, 2007 WL 4563443, at *5 (S.D.N.Y. Dec. 27, 2007)
(quoting Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).  "[I]t is
well established in [this] circuit that the objectively
unreasonable standard of § 2254(d)(1) means that [a] petitioner
must identify some increment of incorrectness beyond error in
order to obtain habeas relief."  Cotto v. Herbert, 331 F.3d 217,
248 (2d Cir. 2003) (internal quotation marks omitted); see also
Sookoo, 2011 WL 1542543, at *3.

Section 2254 provides that any factual issues resolved by
the state court shall be presumed to be correct, and the
petitioner has the burden of rebutting this presumption by clear
and convincing evidence.  28 U.S.C. § 2254(e)(1); Williams v.
Artus, 691 F. Supp. 2d 515, 523 (S.D.N.Y. 2010).

Because the petitioner is proceeding pro se, his petition
is "read liberally and should be interpreted to raise the
strongest arguments that [it] suggest[s]."  Graham v. Henderson,
89 F.3d 75, 79 (2d Cir. 1996) (quoting Burgos v. Hopkins, 14
F.3d 787, 790 (2d Cir. 1994)); see also Brito v. Brown, No.
09cv5754, 2011 WL 1542516, at *3 (S.D.N.Y. Apr. 21, 2011).

III.

In the petitioner's first set of claims for relief, the petitioner argues that the trial court denied him the right to a fair trial by failing to charge the jury with: (1) the defense of justification; (2) the affirmative defense of extreme emotional disturbance; and (3) the lesser-included offense of manslaughter in the first degree.

The Supreme Court has instructed that a state court's failure to give a particular jury instruction does not raise a federal question unless the failure to give the instruction "so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Federal courts "must of course defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional" when deciding whether the evidence requires a particular jury instruction under state law. Davis v. Strack, 270 F.3d 111, 123 n.4 (2d Cir. 2001).

In deciding if the failure to give a jury instruction on a particular defense violated the petitioner's federal due process rights, a court must first find that the petitioner was "erroneously deprived of a jury instruction to which he was entitled under state law." Id. at 123. If the court makes that

18

finding, it must then ask whether the failure to give the requested charge was so harmful as to make the conviction unfair.  Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir.2005); Graham v. Lape, 476 F. Supp. 2d 399, 404 (S.D.N.Y. 2007).

A.

In his first claim for relief, the petitioner argues that he was entitled to a justification charge under New York law, and that the trial court's denial of his request for this charge amounted to a violation of his due process rights.  On direct appeal, the petitioner challenged the trial court's failure to give the justification charge, and the Appellate Division unanimously held that the trial court had not erred in denying the charge.  See 870 N.Y.S.2d at 19-20.

The Appellate Division concluded:

The court properly determined that no reasonable view of
the evidence, viewed in a light most favorable to
defendant, supported the submission of a charge on
justification.  Defendant . . . admitted that he carefully
concealed a pistol in his clothing and went to a park to
confront the victim. . . .  The evidence also established
that at one point defendant straddled the victim while he
lay helpless on the ground and continued to fire at him.
Even under defendant's account of the incident, his claimed
belief that the victim's hand motion signified imminent use
of deadly force was not objectively reasonable.
Furthermore, the evidence demonstrated that defendant could
have retreated even after the victim made the alleged hand
motion, as well as that it was unreasonable for defendant
to fire numerous shots.  It was also an unreasonable use of
force, under the circumstances presented, to fire shots in

close proximity to a crowd of people, which was the
circumstance that caused the death of the child.

Id. (internal citations omitted).

New York law provides that a court "must instruct a jury on
the defense of justification 'if on any reasonable view of the
evidence, the fact finder might have decided that the
defendant's actions were justified.'" People v. Cox, 707 N.E.2d
428, 429 (N.Y. 1998) (quoting People v. Padgett, 456 N.E.2d 795,
797 (N.Y. 1983)). "In determining whether the jury should be
given a particular charge, the trial court must look to all of
the evidence introduced at trial and view it in a light most
favorable to the defendant." People v. Dolan, 858 N.Y.S.2d 490,
492 (App. Div. 2008). "A court need not charge justification if
no reasonable view of the evidence establishes the elements of
the defense." People v. Reynoso, 534 N.E.2d 30, 31 (N.Y. 1988);
see also People v. Butts, 533 N.E.2d 660, 663 (N.Y. 1988) ("The
rule is that the jury must be instructed on all claimed defenses
which are supported by a *reasonable view* of the evidence—not by
any view of the evidence, however artificial or irrational.").

New York Penal Law § 35.15(2) provides in relevant part
that a person may not use deadly physical force against another
unless that person "reasonably believes that such other person
is using or about to use deadly physical force." However, even
in such case, "the actor may not use deadly physical force if he

or she knows that with complete personal safety[] to oneself and others he or she may avoid the necessity of so doing by retreating."  N.Y. Penal Law § 35.15(2)(a).

The justification defense consists of objective and subjective prongs: the defendant must subjectively believe that deadly physical force was necessary to defend himself against the imminent use of deadly physical force, and this belief must be objectively reasonable.  Matter of Y.K., 663 N.E.2d 313, 315 (N.Y. 1996); People v. Wesley, 563 N.E.2d 21, 24 (N.Y. 1990); People v. Goetz, 497 N.E.2d 41, 52 (N.Y. 1986).  Additionally, the defense of justification is unavailable if the defendant is the initial aggressor in the encounter with the victim.  People v. Petty, 852 N.E.2d 1155, 1161 (N.Y. 2006); People v. Morales, 782 N.Y.S.2d 437, 438 (App. Div. 2004).

No reasonable view of the evidence supports a justification charge in this case.  De'Aza testified that he had been involved in a physical altercation with the petitioner at some point during the summer of 2005, and the petitioner testified that there were two additional altercations between the petitioner and De'Aza or De'Aza's associates in the weeks leading up to the shooting.  (See Tr. 276-77, 470-74.)  However, the petitioner himself testified that none of these altercations involved firearms, and that they did not cause him to fear for his safety.  (See Tr. at 476, 517-19.)  Moreover, it is well-settled

under New York law that a "defendant, . . . in order to avail himself of the justification defense, cannot be responding to the past use of deadly force, but only to its present or imminent use."  People v. Roldan, 647 N.Y.S.2d 179, 183 (App. Div. 1996).  Accordingly, these incidents, without more, do not support a justification charge.

The petitioner also testified that he received three phone calls on the day of the shooting from various individuals who indicated that De'Aza was threatening to use violence against the petitioner or the petitioner's pregnant girlfriend.[5]  (See Tr. at 478-81.)  To the extent that the petitioner argues these phone calls support a justification defense, that argument is without merit in light of the petitioner's undisputed conduct before, during, and after the shooting.  See Dolan, 858 N.Y.S.2d at 492 ("In determining whether the jury should be given a particular charge, the trial court must look to *all of the evidence introduced at trial* . . . ." (emphasis added)).  The petitioner testified that he prepared for the incident by retrieving a gun from the apartment where he was staying and a hooded sweatshirt from his girlfriend's house and then

---

[5] Under New York law, the justification defense can apply in situations in which the defendant is acting in defense of a third person.  See People v. Rivera, 530 N.Y.S.2d 802, 806 (App. Div. 1988), amended on other grounds by 143 A.D.2d 601 (App. Div. 1988).

affirmatively searching for De'Aza in the neighborhood.[6]   (See
Tr. at 482-84.)   Four eyewitnesses testified that after the
first two shots were fired, the petitioner stood over De'Aza,
who was lying on the ground, and fired multiple additional
shots.   (See Tr. at 154-56, 175, 209, 289.)   De'Aza testified
that while the petitioner was standing over him, the petitioner
said, "I got you now" and then fired a final shot at De'Aza's
head.[7]   (Tr. at 289-90.)   Uncontroverted testimony also
established that the petitioner fled the scene after the
shooting.   (See Tr. at 176, 489.)   This conduct precludes any
reasonable inference that the petitioner was acting in self-
defense at any point during the shooting.   See People v.
Henriquez, 650 N.Y.S.2d 138, 139 (App. Div. 1996) ("[The]
defendant's methodical conduct both during and immediately after
the shooting[] belies defendant's claim that he was acting in
self-defense."); see also People v. Holden, 689 N.Y.S.2d 40, 40
(App. Div. 1999) (finding no justification defense warranted,
even crediting the defendant's testimony that the victim fired
the first shot, where the "defendant . . . precipitated the

---

[6] Indeed, the petitioner testified that the purpose of wearing a
dark-colored hooded sweatshirt with a pocket in front was to
conceal the gun.   (See Tr. at 510, 523-24, 528.)
[7] The petitioner did not dispute what happened after the first
two shots were fired.   Rather, he testified that he did not know
what happened after the first two shots because he "blanked
out."   (Tr. at 488-89, 531-32, 541.)

gunfight by arming himself and displaying a firearm before he
had any reason to believe that his victim was about to use
deadly force against him").

The petitioner testified that he had not planned to shoot
De'Aza when he sought him out in the evening of September 5,
2005, and that he only started shooting when De'Aza reached for
something at his waist, which the petitioner thought was a gun.
(See Tr. at 484, 486.)  However, aside from the petitioner's own
testimony, there is no support for this assertion in the record.[8]
To the contrary, the undisputed testimony from multiple sources,
including the petitioner himself, indicated that the petitioner
methodically prepared for the encounter with De'Aza,
affirmatively sought it out, initiated it when he arrived at the
park, and then fled from the scene when it was over.  In light
of this testimony, the record, taken as a whole, does not yield
any reasonable inference that the petitioner was acting in self-
defense when he shot De'Aza.  See Morales, 782 N.Y.S.2d at 438;
Holden, 689 N.Y.S.2d at 40; Henriquez, 650 N.Y.S.2d at 139.
Moreover, the undisputed testimony also indicated that the
petitioner continued to fire at De'Aza from point blank range

---

[8] De'Aza testified that he had nothing in his hand when the
petitioner started shooting.  (Tr. at 344.)  One eyewitness,
Hilda Alvarez, testified that she "saw that [the petitioner]
came running out and at the same time he just went and put his
hand in his pocket and started firing."  (Tr. at 174.)

after De'Aza had already been incapacitated and any conceivable threat from him had been neutralized.  These shots fired at an immobilized victim rule out any reasonable inference that the petitioner's actions at the park on the night of the shooting were taken in self-defense.

Furthermore, even crediting the petitioner's unsupported assertion that he was acting in self-defense during the entire course of the shooting, the petitioner cannot plausibly argue that he did not know he had a reasonable means of safe retreat as an alternative to firing multiple rounds at De'Aza in a crowded park.  Under New York law, the justification defense is unavailable if a defendant knows he could have safely retreated. People v. Russell, 693 N.E.2d 193, 196 (N.Y. 1998).  In this case, multiple witnesses testified that the shooting began when the petitioner emerged from between two cars and opened fire, (see Tr. at 173-74, 176, 204-05), and the petitioner's own testimony corroborates these facts.  (See Tr. at 488, 524.) Thus, even if De'Aza posed a credible threat to the petitioner's safety, the petitioner plainly avoided an opportunity for safe retreat.  See Roldan, 647 N.Y.S.2d at 183; People v. Vasquez, 555 N.Y.S.2d 451, 452 (App. Div. 1990).  Accordingly, there is no reasonable inference from the record that the petitioner's only available means of avoiding an imminent threat of deadly physical force was firing multiple shots in a crowded park with

25

children present.  The trial court therefore properly denied the petitioner's request for a justification charge, and the Appellate Division properly concluded that the petitioner was not entitled to this charge under New York law.

Finally, the Court notes for purposes of completeness that even if the trial court had erred in failing to give the justification charge, this error would not be a basis for habeas relief.  "[I]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law."  Davis, 270 F.3d at 123 (citations omitted).  "Because an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law, [a] petitioner bears a heavy burden in showing that the failure to instruct rises to the level of a constitutional violation."  Buckner v. Burge, No. 06cv1180, 2010 WL 1328982, at *8 (E.D.N.Y. Mar. 31, 2010) (internal citations and quotation marks omitted).  "In determining when the refusal to charge the jury on an affirmative defense is sufficiently harmful to violate federal due process, the Second Circuit has focused on the issues of whether the affirmative defense was central to the petitioner's

theory at trial and whether that defense was made out by credible evidence." Id. at *9.

Here, given that the petitioner admitted that he shot both victims, (see Tr. at 486, 510-11), the justification defense was clearly central to his case.  Nevertheless, the justification defense was not supported by any credible evidence.  Rather, the crucial support for the defense were portions of the petitioner's own testimony in which he claimed that his purpose for seeking out De'Aza at the park was merely to speak with him, and that De'Aza appeared poised to pull a gun on him when De'Aza reached for something at his waist.  In order to credit this testimony, the jury would have had to parse it from substantial and well-corroborated portions of the rest of the petitioner's testimony indicating that the petitioner methodically prepared for the encounter, concealed a weapon, and fired it at De'Aza in a crowded park in spite of an obvious opportunity for retreat. There is no plausible circumstance under which the jury would have parsed the petitioner's testimony in this way and credited only those portions of it that were uncorroborated.  See Balzic v. Henderson, 900 F.2d 534, 542-43 (2d Cir. 1990); Buckner, 2010 WL 1328982 at *9.  The justification theory was therefore far from the sort of "highly credible defense" that has warranted habeas relief in cases where a trial court has erroneously failed to give a requested instruction.  Davis, 270 F.3d at 131.

Rather, it was a "fantastic, improbable defense that the jury was unlikely to adopt," and any error in the failure to charge justification would therefore not have rendered the trial unfair in violation of the petitioner's due process rights.[9] Buckner, 2010 WL 1328982, at *10.

In sum, then, the refusal of the trial court to give the justification charge did not violate state law or the petitioner's due process rights, and the petitioner's first claim for relief must therefore be denied.


B.

Next, the petitioner argues that his due process rights were violated when the trial court refused to charge the jury on the affirmative defense of extreme emotional disturbance.  The first step in addressing this claim is to assess whether the petitioner was "erroneously deprived of a jury instruction to which he was entitled under state law." Davis, 270 F.3d at 123.

The Appellate Division rejected the petitioner's claim on direct appeal that the trial court erred in failing to instruct

---

[9] The Appellate Division also concluded that any error in failing to give all of the charges requested by the petitioner was harmless because "there [wa]s no reasonable possibility that the jury, even if instructed as defendant wished, would have credited his version of the incident in the face of overwhelming prosecution evidence that the incident did not occur as defendant described it, but was in fact a premeditated ambush." 870 N.Y.S.2d at 20.

the jury on the affirmative defense of extreme emotional disturbance:

> [V]iewing the evidence in a light most favorable to defendant, there was no reasonable view of the evidence to support that defense.  Even accepting defendant's account of the incident and his claim of being in great fear of the surviving victim, the evidence failed to establish that defendant suffered from any mental infirmity at the time of the shooting, and it also showed that he acted with a high degree of self-control that was inconsistent with the extreme emotional disturbance defense.

870 N.Y.S.2d at 20 (citations omitted).

Under New York law, extreme emotional disturbance is a partial affirmative defense to the crime of second degree murder.  See N.Y. Penal Law §§ 125.25(1)(a) & 125.20(2).  Thus, "a defendant who proves by a preponderance of the evidence that he or she committed a homicide while under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse is guilty of manslaughter and not murder." People v. Roche, 772 N.E.2d 1133, 1137-38 (N.Y. 2002).  An instruction on extreme emotional disturbance would have allowed the jury to consider the offense of manslaughter in the first degree under New York Penal Law § 125.20(2).  See id.

For a defendant to be entitled to an instruction on extreme emotional disturbance under New York law, "sufficient evidence must be presented for the jury to find by a preponderance of the evidence that the elements of the affirmative defense are

satisfied." People v. Moye, 489 N.E.2d 736, 738 (N.Y. 1985) (citation omitted).

The defense of extreme emotional disturbance requires evidence that the defendant suffered from "a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-control." Roche, 772 N.E.2d at 1138; see also People v. Matthews, 632 N.Y.S.2d 298, 300 (App. Div. 1995) (noting that the defense is "characteristic[ally associated with] loss of complete control"). This defense consists of a subjective and an objective component. First, the defendant must prove that the defendant acted under the influence of an extreme emotional disturbance. Second, the defendant must prove that there was a reasonable explanation or excuse for the disturbance. Roche, 772 N.E.2d at 1138. The objective element is "determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation or excuse for the emotional disturbance was reasonable." Id. (citations omitted). In determining whether a defendant has acted out of a loss of self-control, courts typically consider the defendant's conduct before and after the homicide in question. See Wilson v. Phillips, No. 05cv1208, 2010 WL 545862, at *7 (E.D.N.Y. Feb.

16, 2010); Zamora v. Phillips, No. 04cv4093, 2006 WL 2265079, at
*6 (E.D.N.Y. Aug. 8, 2006).

Here, the petitioner argues that the cumulative effects of
the altercations with De'Aza and the threats allegedly conveyed
to him from De'Aza on the day of the shooting caused him to lose
self-control.  Indeed, the petitioner testified that he "lost
[his] head" after receiving a phone call indicating that De'Aza
had threatened to harm his pregnant girlfriend, (Tr. at 481),
and that he "blanked out" during the second part of the
shooting.  (Tr. at 488-89, 531-32, 541.)  However, the
undisputed testimony also indicates that after receiving the
alleged threatening phone calls, the petitioner prepared for the
shooting by retrieving a gun and a hooded sweatshirt from two
separate locations, that he told his girlfriend he was going to
have a talk with De'Aza when he found him, and that he carefully
sought out De'Aza.  These preparations are inconsistent with a
loss of self-control sufficient to warrant an extreme emotional
disturbance charge under New York law.  See, e.g., Delgado v.
Walker, 798 F. Supp. 107, 114 (E.D.N.Y. 1992) (emphasizing that
deliberate acts prior to a shooting negate the basis for an
extreme emotional disturbance charge).

Similarly, the petitioner's actions subsequent to the
shooting undermine the petitioner's assertion that he lost
control.  According to his own testimony, the petitioner left

31

the scene after the shooting and returned to the apartment
building where he had been staying.[10]   (See Tr. at 490, see also
Tr. at 176, 209, 230-31.)   At some point thereafter, the
petitioner's girlfriend met him and explained to him that two
individuals had been shot, including a child.   (Tr. at 491-92.)
When a crowd of people appeared to be attempting to enter the
apartment, the petitioner fled down the fire escape and
eventually fell to the ground, (see Tr. at 493; see also
Resp't's Opp'n, Ex. 23 at 21-26), at which point the police
apprehended him.   (Tr. at 231-32.)

These attempts to avoid apprehension "reveal [an] enduring
regard for self-preservation" that undermines any claim that the
petitioner lost self-control during the shooting.[11]   Wilson, 2010
WL 545862, at *8; see also Shiwlochan v. Portuondo, 345 F. Supp.
2d 242, 269 (E.D.N.Y. 2004) ("[L]eaving the scene of the crime
and taking other steps to avoid apprehension have been found to

---

[10] At some point between the park and the apartment, the
petitioner lost the gun he had used during the shooting.   (See
Tr. 249, 490; see also Resp't's Opp'n, Ex. 23 at 22.)
[11] The petitioner emphasizes that he accepted responsibility for
having caused the deaths of De'Aza and Pearson during two
statements made to law enforcement after the shooting and during
his testimony at trial, but this does not change the conclusion
reached here regarding the petitioner's self-control before,
during, and after the shooting.   See Zamora, 2006 WL 2265079, at
*7 (concluding that the defendant-petitioner's efforts at
avoiding detection prior to his ultimate confession undermined
any contention that he had lost control for purposes of the
extreme emotional disturbance defense).

32

be inconsistent with the loss of control associated with an [extreme emotional disturbance] defense." (citation omitted)), aff'd, 150 F. App'x 58 (2d Cir. 2005) (summary order); Roche, 772 N.E.2d at 1139 (finding that the defendant's "attempt to evade detection" undermined the basis for a defense of extreme emotional disturbance).

Given the petitioner's undisputed conduct before, during, and after the shooting, no reasonable view of the evidence would have permitted a finding that the petitioner satisfied either prong of the requirements for the defense of extreme emotional disturbance under New York law, and the trial court therefore did not err in denying the petitioner's request for an instruction on extreme emotional disturbance. See Wilson, 2010 WL 545862, at *8; Zamora, 2006 WL 2265079, at *6-7. There was no reasonable view of the evidence that the petitioner acted under the influence of an extreme emotional disturbance or that the petitioner's responses were reasonable. The petitioner's claim that his due process rights were violated when the trial court failed to give a charge on extreme emotional disturbance is, accordingly, without merit, and his claim for habeas relief on this basis must be denied. See Moronta v. Griffen, No. 13cv4081, 2014 WL 956297, at *8-9 (S.D.N.Y. Mar. 11, 2014).

C.

Third, the petitioner argues that his due process rights were violated when the trial court refused to charge the jury on the lesser-included offense of manslaughter in the first degree.

The petitioner raised this claim on direct appeal, and the Appellate Division rejected it as a matter of state law:

> Defendant was charged with the murder of the child bystander under a transferred intent theory.  The court properly refused to submit manslaughter in the first degree as a lesser included offense, since there was no reasonable view of the evidence, viewed, once again, most favorably to defendant, that he merely intended to inflict serious physical injury on the surviving victim but not death. Defendant's course of conduct, even as he described it in his testimony, established that he kept firing at the victim for the purpose of killing him.

870 N.Y.S.2d at 20.

In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court held that due process requires the submission of jury instructions on lesser-included offenses in capital cases but declined to consider whether such instructions are required in non-capital cases.  Id. at 638 n.14.  The Courts of Appeals are in some disagreement about whether the failure to include a lesser-included offense instruction can rise to the level of a constitutional violation in a non-capital case.  See Robertson v. Hanks 140 F.3d 707, 709-11 (7th Cir. 1998) (summarizing cases).  The Court of Appeals for the Second Circuit has not decided the question.  See Jones v. Hoffman, 86 F.3d 46, 48 (2nd

34

Cir. 1996).  However, in Jones, the Court of Appeals held that a claimed error in failing to include a lesser-included offense instruction in a non-capital case is not a cognizable claim in a habeas corpus proceeding.  Id.  The Court of Appeals reasoned that under Teague v. Lane, a habeas petition cannot be used to apply a new rule of law.  489 U.S. 288, 301 (1989).  The Court of Appeals also held that none of the exceptions to Teague would apply to allow consideration of a claimed constitutional violation for failure to include a lesser-included offense instruction in a non-capital case.  Jones, 86 F.3d at 48.  Therefore, Jones and Teague preclude consideration of the petitioner's claim that he was entitled to the lesser charge of manslaughter in the first degree.  See Brito, 2011 WL 1542516, at *7; Till v. Miller, No. 96cv4387, 1998 WL 397848, at *4 (S.D.N.Y. July 16, 1998).[12]

For the sake of completeness, the Court also notes that the petitioner's third claim for habeas relief fails to establish a

---

[12] This result also follows from the statutory scope of review of the state court's determination of the petitioner's claim.  It cannot be said that the state court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  See 28 U.S.C. § 2254(d)(1).  The Supreme Court has declined to rule on whether the Constitution requires charges of lesser-included offenses in non-capital cases.  See Beck, 447 U.S. at 638 n. 14; see also Brito, 2011 WL 1542516, at *7 n.1; Till v. Miller, 1998 WL 397848, at *4 n.4.

violation of state law.[13]  Under New York law, in order to
establish entitlement to a lesser-included offense charge, a
defendant must make two showings: "it must now be shown that, in
theory, the charged, greater crime could not be committed
without the lesser offense also being committed and,
additionally, that in the particular case the jury would be
warranted in finding that the defendant committed the lesser but
not the greater crime."  People v. Glover, 439 N.E.2d 376, 377
(N.Y. 1982) (per curiam).  In order to warrant a first-degree
manslaughter charge under state law, the evidence, when viewed
in the light most favorable to the petitioner, must have
supported the reasonable view that the petitioner intended to
cause serious physical injury rather than death.  People v.
Gauze, 770 N.Y.S.2d 749, 750 (App. Div. 2004); People v. Spears,
707 N.Y.S.2d 127, 128 (App. Div. 2000).

---

[13] For this reason, the petitioner's claim that the trial court
erroneously failed to give a lesser-included offense instruction
does not state a claim for the violation of his due process
rights under the standard articulated in Cupp and Davis.  See
Davis, 270 F.3d at 123 (noting that an allegation of an
erroneous jury instruction only raises a cognizable issue of
federal law for habeas review when "the ailing instruction by
itself so infected the entire trial that the resulting
conviction violates due process" (quoting Cupp, 414 U.S. at
147); see also House v. Miller, No. 02cv5379, 2003 WL 23198788,
at *15-16 (E.D.N.Y. Oct. 27, 2003) (addressing under the Cupp
standard a habeas claim that the state trial court failed to
give a lesser-included offense charge).

There is no reasonable view of the evidence in this case that would have supported a finding that the petitioner committed first-degree manslaughter rather than second-degree murder.  The undisputed testimony of multiple eyewitnesses established that the petitioner fired multiple shots at De'Aza from close range, and then stood over De'Aza and continued to fire at him from point-blank range.  (See Tr. at 175-76, 207-09, 289.)  De'Aza testified that the petitioner said, "I got you now."  (Tr. at 289).  Under such circumstances, there can be no reasonable inference that the petitioner intended merely to injure De'Aza, rather than to kill him.[14]  See, e.g., People v. Simmons, 948 N.Y.S.2d 681, 683 (App. Div. 2012); Spears, 707 N.Y.S.2d at 128; People v. Kelly, 633 N.Y.S.2d 845, 846 (App. Div. 1995).  The petitioner did not controvert this eyewitness testimony—instead, he merely testified that he had no memory of firing the last few shots at De'Aza.  Accordingly, no reasonable

---

[14] De'Aza testified that the petitioner attempted to fire his last shot at De'Aza's head, but that De'Aza put his arm up. (See Tr. at 290.)  The petitioner argues that the evidence did not conclusively establish that he intended to kill De'Aza because De'Aza did not have a bullet wound in his head.  Given that multiple eyewitnesses testified that the petitioner fired multiple shots at De'Aza while standing over him at point-blank range, and that the petitioner's testimony does not controvert this eyewitness testimony, the petitioner's argument is without merit.  See People v. Dennis, 617 N.Y.S.2d 908, 909 (App. Div. 1994).

view of the evidence would have supported the lesser-included offense charge under state law.

For these reasons, the petitioner's claim that he was deprived of his right to due process when the trial court failed to give the lesser-included offense charge is without merit, and the petitioner's third claim for habeas relief must therefore be denied.

IV.

In his next set of claims, the petitioner challenges the sentence imposed by the trial court.  First, he claims that the imposition of consecutive sentences in his case violated New York Penal Law § 70.25(2); second, he claims that his sentence should be reduce as excessive; and third, he claims that the imposition of consecutive sentences in his case violated the rule in Apprendi v. New Jersey, 530 U.S. 466 (2000).

A.

In support of his fourth claim for relief, the petitioner argues that the imposition of consecutive sentences violated New York Penal Law § 70.25(2) because the counts for which he received consecutive sentences did not arise out of separate and distinct acts.  Under § 70.25(2), "[w]hen more than one sentence

of imprisonment is imposed on a person for two or more offenses committed through a single act or omission . . . the sentences . . . must run concurrently."  The petitioner was ultimately sentenced to two terms of imprisonment to run consecutively: one term of twenty-five years to life on the count of murder in the second degree, and one determinate term of twenty-five years on the count of attempted murder.

This claim, without more, is not cognizable on habeas review because it amounts to an allegation that the state court erroneously applied state law.  See Estelle, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Thomas v. Larkin, No. 12cv2899, 2013 WL 5963133, at *13 (E.D.N.Y. Nov. 7, 2013) ("[W]hether the sentencing court properly applied New York State Penal Law § 70.25 in determining that [the petitioner's] sentences were consecutive rather than concurrent is not cognizable on federal habeas review."); Bryant v. Graham, No. 08cv4666, 2011 WL 3876972, at *11 (E.D.N.Y. Sept. 1, 2011) (same); Davis v. Greiner, No. 02cv6802, 2003 WL 23198786, at *12 (E.D.N.Y. Oct. 30, 2003) (same).

In any event, it is clear that the petitioner's consecutive sentences were not imposed in violation on New York Penal Law § 70.25(2).  For purposes of Section 70.25(2), each act of "pulling a trigger to discharge a firearm" is a "separate and

distinct act."  People v. McKnight, 942 N.E.2d 1019, 1023 (N.Y. 2010).

On direct appeal, the Appellate Division rejected the petitioner's claim as a matter of state law.  The Appellate Division explained:

> The People met their burden of establishing the legality of the consecutive sentences imposed.  Although defendant's intent with respect to each act was to kill the surviving victim, he committed separate and distinct acts when he fired his first shot, which killed the child, and then fired several more shots, seriously injuring the intended victim.

870 N.Y.S.2d at 20 (internal citations omitted).

The testimony at the petitioner's trial established that Naiesha Pearson was hit by one of the several bullets fired at De'Aza.  (See Tr. at 355 (testimony by medical examiner confirming one gunshot wound during Pearson's autopsy); see also Tr. at 153-54 (testimony by eyewitness explaining that after Pearson was hit, the petitioner stood over De'Aza and fired more shots at him).)  Testimony also established that multiple other bullets hit De'Aza.  (See Tr. at 286.)  Thus, at least some of the shots fired at De'Aza constituted "separate and distinct acts" from the shot that hit Pearson, and consecutive sentences were therefore permissible under the statute.[15]  See McKnight,

---

[15] The petitioner argues that he fired all shots with one unified intent—the intent to harm De'Aza—but this contention is of no relevance, because "[t]he test is not whether the criminal intent is one and the same and inspiring the whole transaction,

942 N.E.2d at 1023; People v. Azaz, 890 N.E.2d 883, 875 (N.Y. 2008).

For these reasons, the petitioner's fourth claim for habeas relief must be denied.


B.


In his fifth claim for relief, the petitioner argues that his sentence is excessive, and that it should be reduced in the interest of justice to concurrent terms of imprisonment. Because this claim was not raised in any state court forum, it is unexhausted. See, e.g., Sookoo, 2011 WL 1542543, at *7; Williams v. Corcoran, No. 07cv2182, 2008 WL 394806, at *2 (S.D.N.Y. Feb. 13, 2008). However, 28 U.S.C. § 2254(b)(2) provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." If unexhausted claims are "plainly meritless," the

---

but whether separate acts have been committed with the requisite criminal intent." People v. Day, 535 N.E.2d 1325, 1327 (N.Y. 1989) (citations omitted). The petitioner also argues that consecutive sentences were not warranted because the act that resulted in Pearson's death overlapped with an act that underlay the attempted murder of De'Aza, but this argument is similarly without merit because additional, separate acts fulfilled the actus reus requirement for the attempted murder of De'Aza, and consecutive sentences were therefore permissible under § 70.25(2). See McKnight, 942 N.E.2d at 1023.

district court can dismiss such claims on the merits.  Rhines v.
Weber, 544 U.S. 269, 277 (2005); see also Artus, 691 F. Supp. 2d
at 526.

The petitioner's fifth claim is plainly meritless.
Although New York's Appellate Division has the power, pursuant
to New York Criminal Procedure Law § 470.15(3), to reduce a
sentence in the interest of justice, a claim for a reduction in
sentence pursuant to § 470.15 does not, without more, raise a
federal constitutional issue and is therefore not cognizable on
habeas review.  See Medina v. Greene, No. 03cv8646, 2004 WL
2809196, at *5 (S.D.N.Y. Dec. 7, 2004).  The petitioner does not
challenge his sentence as constitutionally disproportionate,[16]
and because the sentence falls within the range prescribed by
state statutory law, the length of the sentence cannot be a
basis for federal habeas relief.  Thomas v. Senkowski, 968 F.
Supp. 953, 956 (S.D.N.Y. 1997).

---

[16] Any such claim would be without merit.  A sentencing judge's
decision to sentence a defendant within the prescribed statutory
range can only be overturned "if the sentence imposed was so
'significantly disproportionate' to the crime committed as to
constitute 'cruel and unusual' punishment within the meaning of
the Eighth Amendment," and federal courts have consistently held
sentences such as the one imposed in this case to be permissible
under the constitution.  See Gaiter v. Lord, 917 F. Supp. 145,
154-55 & n.22 (E.D.N.Y. 1996) (collecting cases).

C.

In his sixth claim for relief, the petitioner argues that his sentence is unconstitutional because it was imposed in violation of the rule stated by the Supreme Court in Apprendi. The respondent argues that this claim has been procedurally defaulted, and that, in any event, it is without merit.

In addressing the petitioner's challenge to his consecutive sentences on direct appeal, the Appellate Division held that the claim was "unpreserved and without merit," 870 N.Y.S.2d at 20, thus relying on New York's preservation policy, codified in New York Criminal Procedure Law § 470.05(2).  Section 470.05 grants an appellate court the discretion to decline to review claims if they were not sufficiently presented to, or decided by, the trial court.[17]  See Ashley v. Burg, No. 05cv4497, 2006 WL 3327589, at *4 (S.D.N.Y. Nov. 3, 2006).

Where "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred

---

[17] Specifically, the statute provides in relevant part that "[f]or the purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."  N.Y. Crim Proc. Law § 470.05(2).

unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); see also Lee v. Kemna, 534 U.S. 362, 375 (2002); Cotto v. Herbert, 331 F.3d 217, 238 (2d Cir.2003); Ashley, 2006 WL 3327589, at *4.  An independent state law ground "will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (citation omitted).

Here, the Appellate Division relied on New York's preservation policy as an independent ground for rejecting the petitioner's Apprendi claim.[18]  Cf. Ashley, 2006 WL 3327589, at *5.  Moreover, no basis has been proffered for doubting the consistency with which New York courts apply the preservation rule to claims such as the petitioner's, and courts have generally concluded that the preservation rule is an adequate

---

[18] The Appellate Division's determination that the claim had been unpreserved is an independent state ground despite the Appellate Division's alternative ruling that the claim was meritless.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (stating that "a state court need not fear reaching the merits of a federal claim in an alternative holding" because the independent and adequate state ground doctrine "curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision"); Ashley, 2006 WL 3327589, at *5 n.5.

state law ground as applied under similar circumstances.  See, e.g., Ortiz v. Brandt, No. 13cv5420, 2013 WL 5775695, at *2 (E.D.N.Y. Oct. 25, 2013); Mendez v. Graham, No. 11cv5492, 2012 WL 6594456, at *10 (E.D.N.Y. Dec. 18, 2012); see also Garcia, 188 F.3d at 79 ("[W]e have observed and deferred to New York's consistent application of its [preservation policy]."). Finally, the petitioner has offered no reason for his failure to comply with New York's preservation policy, and there is no basis to conclude that this Court's failure to address his Apprendi claim would result in a fundamental miscarriage of justice.  Accordingly, the petitioner's Apprendi claim is procedurally barred.

In any event, it is also plain that the Apprendi claim is without merit.  In Apprendi, the Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. at 490.  The petitioner argues that the imposition of consecutive sentences under New York Penal Law § 70.25(2) violated this rule because it was premised on factfinding unrelated to the petitioner's criminal history—namely, the finding that the attempted murder of De'Aza and the murder of Pearson involved "separate and distinct acts."

This argument is foreclosed by the Supreme Court's decision in Oregon v. Ice, 555 U.S. 160 (2009). In Ice, the Supreme Court faced an Apprendi-based challenge to the imposition of consecutive sentences under an Oregon statute that permitted consecutive sentencing for defendants convicted of crimes "that do not arise from the same continuous and uninterrupted course of conduct," as determined by the sentencing judge. See 555 U.S. at 165 (quoting Or. Rev. Stat. § 137.123(2)). Reasoning that Apprendi had relied on the jury's historic role, and that, historically, juries played no role in the decision of whether to impose concurrent or consecutive sentences, the Court declined to apply Apprendi to the decision of whether sentences should be imposed consecutively. Id. at 168-72. In light of Ice, the petitioner's Apprendi-based challenge to the imposition of consecutive sentences in his case is without merit. See Webb v. Walsh, No. 07cv2655, 2010 WL 2985879, at *5-6 (E.D.N.Y. July 23, 2010); Lasso-Reina v. Haponick, No. 05cv8817, 2009 WL 3334843, at *14-15 (S.D.N.Y. Oct. 14, 2009).

For the foregoing reasons, the petitioner's sixth claim for relief must be denied.

V.

In his final set of claims, the petitioner challenges the effectiveness of his trial counsel. First, the petitioner claims that he was denied the effective assistance of counsel during the plea stage because his trial counsel failed to communicate the terms of a plea offer to him that he would have accepted if he had known about it. Second, the petitioner claims that his trial counsel was ineffective for failing to secure his right to testify before the grand jury. Third, the petitioner claims that his trial counsel was ineffective for failing to challenge the Indictment as defective. And fourth, the petitioner claims that his trial counsel was ineffective for failing to argue successfully for the suppression of his post-arrest statements to law enforcement.

Any claims of ineffective assistance of counsel must be evaluated under the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). To prevail on these claims, the petitioner must show both (1) that his counsel's performance was deficient in that it was objectively unreasonable under professional standards prevailing at the time, and (2) that counsel's deficient performance was prejudicial to the petitioner's case. See Strickland, 466 U.S. at 687-88; Gersken v. Sankowski, 426 F.3d 588, 607 (2d Cir. 2005). Self-serving

47

conclusory allegations to this effect are insufficient to establish ineffective assistance of counsel.  United States v. Torres, 129 F.3d 710, 715-17 (2d Cir. 1997); United States v. Gonzalez, 970 F.2d 1095, 1099-1101 (2d Cir. 1992); see also Dedushaj v. Graham, No. 07cv5401, 2008 WL 4858242, at *2 (S.D.N.Y. Nov. 7, 2008).

A petitioner cannot meet the first prong of the Strickland test merely by showing that his counsel employed poor strategy or made a wrong decision.  Instead, the petitioner must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  LanFranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002) (quoting Strickland, 466 U.S. at 687); see also Hernandez v. United States, 280 F. Supp. 2d 118, 122 (S.D.N.Y. 2003).  Indeed, there is a "strong presumption" that the defense counsel's conduct fell within the broad spectrum of reasonable professional assistance, and a defendant has the burden of proving "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."  Kimmelman v. Morrison, 477 U.S. 365, 381 (1985) (citing Strickland, 466 U.S. at 688-89).

To satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome."
Strickland, 466 U.S. at 694; see also Gersten, 426 F.3d at 607.
With respect to a claim by a petitioner that the petitioner
would have pleaded guilty if his counsel had urged him to do so,
the petitioner must demonstrate that there is a "reasonable
probability" that but for his counsel's deficiencies, he would
have pleaded guilty.  Purdy v. United States, 208 F.3d 41, 49
(2d Cir. 2000); see also Dedushaj, 2008 WL 4858242, at *3.


                                A.

     In his seventh claim for relief, the petitioner alleges
that he was denied the effective assistance of counsel when his
trial counsel failed to advise him properly regarding a plea
offer of an aggregate twenty-year determinate term of
imprisonment.  The petitioner alleges that his counsel conveyed
this offer to him on January 18, 2006, but that she failed to
advise him about the strengths and weaknesses of his case, and
that before he had time to respond to the offer it was taken off
the table.  The petitioner appears to argue that if he had
received proper advice regarding this offer, the strength of his
case, and the possible sentence upon conviction after trial, he
would have accepted the offer.

"[D]efense counsel must give the client the benefit of counsel's professional advice on [the] crucial decision of whether to plead guilty.  As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy, 208 F.3d at 44-45 (internal citations and quotation marks omitted); see also Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012).

The petitioner raised his claim regarding his counsel's alleged failure to advise him about a January 18, 2006 plea offer in his first § 440.10 motion.  Justice Richard Price rejected this claim, concluding on the basis of the record that no plea offer of a determinate twenty-year term was ever made, and that, in any event, the petitioner had informed his lawyer that he would have been unwilling to accept a determinate term of twenty years if such an offer had been made. (See Resp't's Opp'n, Ex. 10 at 3-5.)

In connection with the § 440.10 motion, the petitioner's trial counsel, Amy Attias, submitted an affirmation in which she attested that she advised the petitioner of the strength of the prosecution's case against him, and of the possibility that he would be sentenced to consecutive terms of twenty-five years to life upon conviction. (See Resp't's Opp'n, Ex. 7 ¶¶ 8-10.)

50

Attias explained that she would attempt to negotiate an offer
for a twenty-year determinate term on the petitioner's behalf,
but the petitioner informed her that twenty years was "too much
time," and that he would not accept such an offer if it were
made.  (Resp't's Opp'n, Ex. 7 ¶¶ 11-12.)  Attias nevertheless
approached ADA Daniel McCarthy on January 18, 2006 and attempted
to negotiate a twenty-year determinate term.  (Resp't's Opp'n
Ex. 7 ¶ 13.)  McCarthy rejected any possibility of a twenty-year
determinate term, and informed Attias that the lowest possible
offer would be for a term of twenty years to life.  (Resp't's
Opp'n, Ex. 7 ¶ 13.)  Attias memorialized this conversation in a
log she kept in the petitioner's file with the annotation,
"possible offer of 20 – life."  (Resp't's Opp'n, Ex. 7 ¶ 13 &
Ex. 9.)  When Attias communicated to the petitioner the
possibility of an offer of twenty years to life, the petitioner
informed her that he would not accept any such offer because it
was too much time.  (Resp't's Opp'n, Ex. 7 ¶ 14.)  On January
19, 2006, Attias again approached McCarthy and this time
attempted to negotiate an offer for eighteen or nineteen years
to life, but McCarthy would not agree.  (Resp't's Opp'n, Ex. 7
¶ 15.)  Thereafter and throughout the pre-trial stages of
proceedings, Attias repeatedly urged the petitioner to
reconsider allowing her to seek an offer for a twenty-year-to-
life term on the petitioner's behalf.  (Resp't's Opp'n, Ex. 7

¶ 16.)  Attias also spoke with the petitioner's family members and advised them of the risk of receiving consecutive twenty-five-to-life terms upon conviction after trial.  (Resp't's Opp'n, Ex. 7 ¶ 17.)  The petitioner nevertheless elected to go to trial, and was ultimately sentenced to consecutive terms of twenty-five years to life and twenty-five years.

ADA McCarthy also submitted a declaration in connection with the petitioner's first § 440.10 motion, in which he confirmed that Attias had approached him and sought an offer for a determinate term of twenty years, and that McCarthy had denied this request and informed Attias that he would not agree to a plea to anything less than a sentence of twenty years to life imprisonment.  (See Resp't's Opp'n, Ex. 8 ¶¶ 5-6.)  McCarthy attested in unequivocal terms that he never offered a plea deal to the petitioner.  (Resp't's Opp'n, Ex. 8 ¶ 8.)

In light of this evidence, Justice Price reasonably concluded that the petitioner's self-serving assertion regarding his counsel's failure to advise him about a plea offer of a determinate twenty-year term of imprisonment was "wholly unsubstantiated," and that there was no basis for concluding that Attias's representation was deficient under the first prong of the Strickland test.  The petitioner has the burden on the present motion of rebutting by clear and convincing evidence the presumption that the state court's factual findings were

52

correct, see 28 U.S.C. § 2254(e)(1), and he has failed to meet this burden.  There has been no showing that Attias failed to advise the petitioner regarding a plea offer; rather, it is clear that despite Attias's attempts to negotiate an offer that would be acceptable to the petitioner, no offer was ever made. Indeed, Attias diligently tried to obtain a favorable plea deal for the petitioner and to inform him of the risks of going to trial in spite of the petitioner's position that he would not accept an offer such as the one he now alleges was made, which was more favorable than any offer the prosecution was ever willing to make.  The petitioner provides no evidence to controvert these facts except for the self-serving statement that he was improperly advised regarding an alleged offer of twenty years.  Accordingly, it is plain that the petitioner's right to the effective assistance of counsel during plea stages was not violated, and that the petitioner's seventh claim for relief is without merit.[19]  See Green v. Portundo, No. 02cv4198, 2003 WL 23199872, at *14-16 (E.D.N.Y. Oct. 27, 2003).

---

[19] The Court also notes that the petitioner's self-serving assertion that he would have accepted the alleged plea offer for a determinate term of twenty years if he had been properly advised regarding the pros and cons of going to trial is refuted by Attias's attestation that the petitioner informed her he would not agree to any such offer.  (Resp't's Opp'n, Ex. 7 ¶ 12.)  In light of this evidence, there could be no showing that but for Attias's alleged deficiencies, the petitioner would have accepted the alleged plea offer, and therefore no showing of prejudice under the second prong of Strickland.

B.

In support of his eighth claim for relief, the petitioner alleges that he was denied the right to testify before the grand jury.  The petitioner styles this claim as a claim for the violation of his "Due Process right to testify before the grand jury," but he raises it in his brief in the context of his allegations that he was denied the effective assistance of counsel.  In light of the tenet that a pro se petitioner's papers are to be construed liberally, the Court will address each such claim in turn.[20]

With respect to the claim for the deprivation of the right to testify before the state grand jury, this claim was never raised on direct appeal and is therefore unexhausted.  See, e.g., Aponte v. Edward, No. 99cv4517, 2000 WL 10217, at *2 (S.D.N.Y. Jan. 5, 2000).  This Court may nevertheless still review and deny the claim pursuant to 28 U.S.C. § 2254(b)(2).  See Artus, 691 F. Supp. 2d at 526.  The petitioner's claim for the deprivation of his right to testify before the grand jury is plainly meritless because it does not raise a federal

---

[20] The petitioner raised allegations that he was denied the right to testify before the grand jury in connection with his second § 440.10 motion.  Justice Massaro summarily rejected the claim as meritless because the prosecution had no obligation to inform the defendant of the existence of the grand jury proceedings. See 959 N.Y.S.2d 91, at *4 (Sup. Ct. 2012).  Leave to appeal was denied.  (Resp't's Opp'n, Ex. 20.)

constitutional issue and is therefore not cognizable on habeas review.  Davis v. Mantello, 42 F. App'x 488, 490 (2d Cir. 2002) (summary order); Aponte, 2000 WL 10217, at *3.  Accordingly, this claim must be denied.

The ineffective assistance of counsel allegation also fails to raise a valid claim for relief.  New York Criminal Procedure Law § 190.50 gives a defendant the right to testify at a grand jury proceeding under certain circumstances.  See N.Y. Crim. Proc. Law § 190(5)(a).  But "[c]ounsel's failure to secure a defendant's right to testify before the grand jury does not, by itself, establish ineffective assistance of counsel."  Boyd v. Hawk, 965 F. Supp. 443, 451 (S.D.N.Y. 1997) (citation omitted). This is so because "[t]here are a number of valid, tactical reasons for counsel to decide that [a client] should not testify before the grand jury," including concerns about exposing the defendant to cross-examination or waiving the privilege against self-incrimination.  See Kohler v. Kelly, 890 F. Supp. 207, 213 (W.D.N.Y. 1994), aff'd, 58 F.3d 58 (2d Cir. 1995) (per curiam). Here, it is difficult to see how reasonable defense counsel would have advised the defendant to testify before the grand jury in order to give testimony that was ultimately rejected by the trial jury.  Although it is not clear whether Attias informed the petitioner of his statutory right to testify before the grand jury, it is nevertheless plain that the petitioner has

proffered no basis to rebut the "strong presumption" that his counsel acted reasonably in failing to secure his appearance before the grand jury. See Boyd, 965 F. Supp. at 449; Kohler, 890 F. Supp. at 213. The first prong of the Strickland test therefore has not been satisfied.

The petitioner has also failed to establish that any alleged deficiency could have prejudiced him in any way. Indeed, given the strong evidence against him and the low burden of proof at grand jury proceedings, any prejudice from the petitioner's failure to testify before the grand jury is highly unlikely. See Boyd, 965 F. Supp. at 451; Kohler, 890 F. Supp. at 214. Moreover, as the Court of Appeals for the Second Circuit has observed, a guilty verdict rendered by a petit jury "means not only that there was probable cause to believe that the defendant[] w[as] guilty as charged, but also that [he is] in fact guilty as charged beyond a reasonable doubt." Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989). Thus, "[m]easured by the petit jury's verdict, . . . any error in the grand jury proceeding connected with the charging decision [is] harmless beyond a reasonable doubt." Id. (citation omitted); see also Newton v. McCauliffe, No. 09cv9818, 2010 WL 2541099, at *6 (S.D.N.Y. June 22, 2010) ("A jury conviction transforms any defect connected with the grand jury's charging decision into harmless error, because the trial conviction establishes

probable cause to indict and also proof of guilt beyond a reasonable doubt." (citation omitted)).

For these reasons, the petitioner has failed to satisfy either prong of the Strickland test, and his claim for ineffective assistance for failure to secure his appearance before the grand jury is without merit.

C.

In his ninth claim for relief, the petitioner argues that the Indictment under which he was charged was defective under New York Criminal Procedure Law § 200.50 because it did not enumerate the specific offenses that he was accused of violating and therefore failed to give him fair notice of the charges against him. This claim is styled as a direct challenge to the validity of the Indictment, but it is raised in the context of the petitioner's claims for the denial of the effective assistance of counsel. Neither variant of the argument has any merit.[21]

---

[21] The petitioner raised a challenge to the validity of his Indictment in connection with his second § 440.10 motion, which Justice Massaro construed as both a direct challenge to the Indictment and a claim for ineffective assistance based on Attias's failure to challenge the validity of the Indictment. Justice Massaro rejected both claims, see 959 N.Y.S.2d at *4-5, and leave to appeal was denied. (Resp't's Opp'n, Ex. 20.)

The petitioner's direct challenge to the validity of his Indictment is unexhausted because it was not raised on direct appeal.  See, e.g., Aponte, 2000 WL 10217, at *2.  This Court may nevertheless still review the claim pursuant to 28 U.S.C. § 2254(b)(2) and deny it as meritless.  See Artus, 691 F. Supp. 2d at 526.  The claim is plainly meritless because it is simply a claim for a violation of a state statute that does not raise a federal constitutional issue and is therefore not cognizable on federal habeas review.  See Campbell v. Poole, 555 F.Supp.2d 345, 378-79 (W.D.N.Y. 2008) (rejecting a federal habeas challenge to validity of an indictment under § 200.50 for failure to raise a federal constitutional issue), reconsid. denied, 2008 WL 2561998 (W.D.N.Y. June 26, 2008).  To the extent the petitioner intends to raise a federal due process challenge to the validity of the Indictment, such claim is also without merit because the Indictment clearly complied with the "basic due process requirements[ of] notice of the time, place, and essential elements of the crime."  Edwards v. Mazzuca, No. 00cv2290, 2007 WL 2994449, at *5 (S.D.N.Y. Oct. 15, 2007) (collecting cases).  There is no constitutional requirement that the prosecution cite in an indictment the specific provision of the criminal statute that a defendant is alleged to have violated, and, indeed, for federal constitutional purposes, a charging instrument such as the one at issue here is

sufficiently specific when it informs a defendant of the time, place, and essential elements of the crime.  See Swanton v. Graham, No. 07cv4133, 2009 WL 1406969, at *11 (E.D.N.Y. May 19, 2009); see also Whaley v. Graham, No. 06cv3843, 2008 WL 4693318, at *9 (E.D.N.Y. Oct. 15, 2008) ("[T]he indictment in this case tracked the particular language set forth in the New York burglary statute and identified the approximate time and place that the attempted burglary occurred, thereby meeting the minimum constitutional standards.").  Here, the language in Counts One and Three of the Indictment—the counts for which the petitioner was ultimately convicted—identifies the offenses, tracks the language of the statutes under which the petitioner was charged, and provides the date, place, and specific victims of the offenses charged.  The Indictment adequately satisfied the due process requirements applicable to state indictments.  For these reasons, the petitioner's direct challenge to the validity of the Indictment is plainly without merit.

For similar reasons, any claim that the petitioner was denied effective assistance of counsel when Attias failed to challenge the validity of the Indictment is also without merit.[22]

---

[22] Attias sought the dismissal of charges in the Indictment by challenging the sufficiency of the evidence before the grand jury, (see Resp't's Opp'n, Ex. 21 at 1), but she did not challenge the Indictment under § 200.50 or allege that it was deficient for lack of notice.

The Indictment plainly provided sufficient notice of the charges against the petitioner under applicable state and federal constitutional law.  See Whaley, 2008 WL 4693318, at *9 (upholding a state-court indictment in the face of a federal constitutional challenge for lack of notice because it tracked the language of the statute); Brown v. Henderson, No. 88cv3264, 1989 WL 47700, at *1-2 (E.D.N.Y. Apr. 28, 1989) (upholding an indictment containing a similar degree of specificity against a challenge under § 200.50 for lack of notice).[23]  Accordingly, there can be no claim that Attias was ineffective for failing to challenge the Indictment on the basis of lack of notice.  See Brown v. United States, Nos. 97cv1880, 92cr816, 97cv2194, & 92cr816, 1998 WL 30273, at *4 (S.D.N.Y. Jan. 28, 1998) ("It is not ineffective assistance to refrain from making baseless arguments." (citation omitted)).  The petitioner's ninth claim for relief must therefore be denied.

---

[23] Under New York law, "an indictment is sufficient if it charges each and every element of the crime and alleges that the defendants committed the acts at a specified place during a specified time period."  People v. Di Noia, 481 N.Y.S.2d 738, 740 (App. Div. 1984), appeal denied, 475 N.E.2d 461 (N.Y. 1984); see also People v. Price, 652 N.Y.S.2d 453, 454 (App. Div. 1996) ("[A]n indictment that states no more than the bare elements of the crime charged and, in effect, parrots the Penal Law is legally sufficient . . . ."), appeal denied, 683 N.E.2d 1063 (N.Y. 1997).  The Indictment in this case satisfied these requirements.  See, e.g., People v. Rosenblatt, 667 N.Y.S.2d 886, 889 (Sup. Ct. 1997) ("The language in the indictment tracks the language of . . . the statute under which the defendant is charged.  That is sufficient in this case.").

D.

In his final claim for relief, the petitioner argues that he was denied the effective assistance of counsel when his trial counsel failed to produce "police reports, medical reports and any other document" in support of his motion to suppress statements he made to police officers shortly after his arrest.

On April 20, 2006, Attias filed a motion to suppress these statements. (Resp't's Opp'n, Ex. 21 at 2.) Among other grounds, Attias argued that the statements should be suppressed because they were involuntary. (Resp't's Opp'n, Ex. 21 at 4.) On April 26, 2007, a Huntley/Dunaway hearing was held before Justice Gross. The only witness to testify was Detective O'Sullivan, who had been called by the prosecution.

O'Sullivan testified that he witnessed the petitioner fall from a fire escape on the second story of the building to which he had fled on the night of the shooting. (Hr'g at 19.) After the fall, the petitioner was handcuffed by Detective Tarsnane, and Tarsnane and O'Sullivan escorted the petitioner to a police car. (Hr'g at 19-20.) The officers then drove the petitioner to the Detective Bureau at 1086 Simpson Street, uncuffed him, and placed him in a holding cell. (See Hr'g at 20-21, 29.) Tarsnane offered the petitioner water and food and the detectives gave him a glass of water. (Hr'g at 21.) At this point the petitioner started to complain about back pain. (Hr'g

61

at 21-22, 45.)  Pursuant to police protocol, the officers called

an ambulance so that the petitioner could be taken to the

hospital.  (Hr'g at 22.)

O'Sullivan testified that while the ambulance was on its

way, O'Sullivan gave the petitioner a Miranda warning,

questioned him, and then Tarsnane hand-wrote a statement

dictated by the petitioner.  (See Hr'g at 24-31.)  The

petitioner made a few corrections to the written statement and

signed it.  (See Hr'g at 28.)  O'Sullivan testified that the

petitioner did not appear to be under the influence of drugs or

alcohol at the time the statement was given, and that although

the petitioner had complained of pain, he appeared responsive

and he had not lost consciousness at any time since his arrest,

and that other than the back pain, the petitioner was

"physically fine."  (Hr'g at 23-24, 50.)  Shortly after the

statement was given, the petitioner was taken by ambulance to

Jacobi Hospital.  (Hr'g at 32.)

O'Sullivan further testified that approximately twelve

hours after the petitioner gave this initial statement,

O'Sullivan visited the petitioner at Jacobi Hospital with ADA

Shockett, where ADA Shockett questioned the petitioner in

O'Sullivan's presence.  (Hr'g at 32-33.)  An audio recording of

the statements given by the petitioner was played during the

hearing.  (Hr'g at 33-35.)

62

Following cross-examination of Officer O'Sullivan by
Attias, Justice Gross heard argument by counsel.  At argument,
Attias conceded that the petitioner had received proper Miranda
warnings, but she argued that the statement made at the station
could not have been voluntary because the petitioner was in
significant back pain and was not thinking clearly, and that the
statement at the hospital should be considered similarly
involuntary because Shockett had made no attempt to ascertain
from hospital personnel whether the petitioner was in proper
condition to be questioned.  (Hr'g at 59-60.)  When asked what
the governing legal standard was, Attias responded that she was
"not suggesting any other statute [sic] outside the
voluntariness standard," and that a defendant's statements made
shortly after events causing physical and emotional trauma
should not be considered voluntary.  (Hr'g at 61.)  Attias
conceded that she was unable to cite case law in support of this
proposition or the proposition that officers have a duty to
inquire with medical personnel into a defendant's ability to
make voluntary statements.  (Hr'g at 63, 67.)  ADA McCarthy for
the prosecution also stated that he knew of no cases supporting
these principles.  (Hr'g at 69.)

Following argument, Justice Gross ruled from the bench that
both statements had been voluntary and denied the motion to
suppress.  (Hr'g at 82, 83.)  During trial, both of the

petitioner's post-arrest statements were introduced into evidence.  (Tr. at 248-49, 392-94.)

The petitioner did not appeal the denial of his suppression motion.  However, in his second section § 440.10 motion, he claimed that he was denied the effective assistance of counsel when Attias failed to cite legal authority in support of her arguments during the Huntley/Dunaway hearing, (Resp't's Opp'n, Ex. 16 at 6), and when Attias failed to introduce medical records from Jacobi Hospital in support of his suppression motion.  Justice Massaro granted the petitioner leave to supplement the record with a transcript of the suppression hearing held before Justice Gross.  See 959 N.Y.S.2d at *5. After reviewing the transcript, Justice Massaro concluded that the petitioner had "failed to convince the Court that (1) counsel acted other than properly concerning the alleged medically coerced statements or (2) the statements were, in fact, received into evidence at trial."  964 N.Y.S.2d at *2-3. On this basis, the petitioner's ineffective assistance claim was denied.  Id. at *3.

The petitioner now argues that counsel was deficient for failing to produce various records in support of his suppression motion, including medical records and a police report.[24]  These

---

[24] The records in question are provided as exhibits to the petitioner's reply affirmation in support of his second § 440.10

records indicate that the petitioner's injuries were sustained when he jumped down twenty-five to thirty feet, that the petitioner was experiencing "back pain and abd [sic] pain," that the petitioner had been prescribed a six milligram dose of intravenous morphine and Percocet to be taken orally as needed. The petitioner also provides a police report that confirms that he fell from a fire escape when people from the neighborhood started throwing bottles at him on the night of his arrest.

Justice Massaro denied the petitioner's ineffective assistance claim on the grounds that 1) Attias had not performed deficiently at the suppression hearing, and 2) there was no evidence of the allegedly involuntary statements having been introduced at trial.  The current record clearly indicates that the petitioner's statements were introduced at trial, and the second ground for Justice Massaro's decision is therefore not entitled to deference.  See 28 U.S.C. § 2254(e)(1).  However, this is not ultimately of any consequence, because the first ground for the decision—which implicitly invokes the first prong of the Strickland test—was neither "contrary to, [n]or . . . an unreasonable application of, clearly established Federal law." Id. § 2254(d)(1).

---

motion, which appears in "Exhibit 5" to the petitioner's current petition, and "Exhibit 5" to the petitioner's current reply brief.

The petitioner argues that his counsel was deficient for
failing to produce various records at his Huntley/Dunaway
hearing that he later produced in connection with his § 440.10
motion and in support of the present petition.  However, these
records merely corroborate other uncontested evidence produced
at the hearing—such as O'Sullivan's testimony that the
petitioner had taken a fall and was suffering from back pain.
It is also plain from the transcript of the petitioner's
interview at the hospital that ADA Schockett was aware that the
petitioner was in pain and that the petitioner was receiving
pain medication.  (See Resp't's Opp'n, Ex. 23 at 3.)  The
prosecution did not dispute these facts during the suppression
hearing, and the production of medical records corroborating
that the petitioner was taking pain medication would therefore
have added little, if anything, to the case for suppressing the
petitioner's second statement.  For these reasons, Attias could
reasonably have concluded that medical documentation of the
petitioner's back pain, or police records documenting his fall,
would not have had any effect on the outcome of the suppression
motion.  Her failure to produce these records in support of the
motion was therefore not objectively unreasonable.  See, e.g.,
Samuels v. Bennett, No. 13cv2340, 2009 WL 2516850, at *22
(S.D.N.Y. Aug. 17, 2009) (failure to produce cumulative evidence
is not ineffective).

For similar reasons, the petitioner also cannot satisfy the second prong of the Strickland test.  The facts favorable to the petitioner in the records that he argues should have been submitted to Justice Gross were separately established through O'Sullivan's testimony, which, in turn, was credited by the court.  (See Hr'g at 77-78.)  Justice Gross acknowledged that the petitioner indicated during the interview that he was in pain and that he was being treated in the hospital for the injuries he had sustained the evening before.  (Hr'g at 80.)  Justice Gross also noted that ADA Shockett told the petitioner to give a signal if he was unable to continue.  (Hr'g at 80-81.)  Justice Gross relied on the actual recorded statement that the petitioner gave in the hospital: "[The petitioner] proceeded to give [in] the next twenty-five minutes or so a statement which was detailed, textured and entirely consistent with both the oral statements and the written statement previously given at the police precinct."  (Hr'g at 81.)  Ultimately, on this basis Justice Gross found: "I am persuaded beyond a reasonable doubt that [the petitioner] knowingly, intelligently, and voluntarily waived his rights and spoke entirely as a product of his own free will. . . .  [The petitioner], though in pain, though at the hospital having presumably received pain medications, was clearly acting as a matter of free will in deciding to speak, and speak again, and yet speak again."  (Hr'g at 82-83.)  Thus,

it is not plausible that the introduction of the records would
have changed the outcome on the suppression motion.  See
Samuels, 2009 WL 2516850, at *4.

Moreover, although the petitioner asserts in conclusory
terms that the suppression of his post-arrest statements would
have changed the verdict at trial, he points to no incriminating
statements made at the Simpson Street Detective Bureau or at the
hospital that were not independently established at trial, and
there is therefore no reasonable probability of a different
verdict if the statements had been suppressed.[25]  For these
reasons, the petitioner has failed to demonstrate the reasonable
probability of prejudice that is required for satisfaction of
the second prong of the Strickland test.[26]

---

[25] The respondent forthrightly indicates that neither of the
post-arrest statements mention that the petitioner thought
De'Aza was reaching for something at his waist before the
petitioner shot at him.  While this omission arguably undermines
the credibility of this allegation in the petitioner's trial
testimony, there was, as explained above, abundant eyewitness
testimony at trial that independently cast significant doubt on
this allegation.  Moreover, other parts of the statements the
petitioner sought to suppress plainly support his own theory
of the case—such as, for example, that he lost consciousness after
firing the first couple shots at De'Aza and was unaware of what
happened thereafter.  (See Resp't's Opp'n, Ex. 23 at 18-19.)
Accordingly, it cannot be concluded that as a whole, the denial
of the suppression motion had any reasonably likely influence on
the outcome at trial.
[26] The petitioner does not appear to argue here—as he did in
support of his second § 440.10 motion—that Attias's failure to
cite case law in support of her arguments at the suppression
hearing constituted ineffective assistance.  In any event, any
such argument would be without merit.  Although Attias did not

In sum, then, Justice Massaro's ruling on the petitioner's ineffective assistance claim was not contrary to, nor an unreasonable application of, clearly established federal law, and the petitioner's final claim for relief must therefore be denied.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the reasons explained above, the petition for a writ of habeas corpus is **denied**. The Court declines to issue a certificate of appealability because the petitioner has failed to make a substantial showing of the denial of a constitutional right.

---

cite specific cases supporting her position, she vigorously argued that the petitioner's statements could not have been voluntary given the trauma he had experienced, the pain he was suffering, and the medication he was taking. The prosecution, for its part, cited New York state cases that clearly reference the relevant federal due process standard. See People v. Anderson, 364 N.E.2d 1318, 1319 (N.Y. 1977). The petitioner fails to explain how Attias could have strengthened her argument on voluntariness by citing any cases. See, e.g., United States v. Salameh, 152 F.3d 88, 117 (2d Cir. 1998) (finding a suspect's statements voluntary despite his weakened mental state because there was no evidence that agents either physically or mentally coerced his statements). For these reasons, Attias's conduct did not fall outside "the broad spectrum of reasonable professional assistance," Dedushaj, 2008 WL 4858242, at *3, nor did it have any plausible effect on the outcome of the suppression hearing or the outcome at trial.

<u>See</u> 28 U.S.C. § 2253(c)(2).  The Clerk is directed to **enter**

**judgment denying the petition and closing this case.**

**SO ORDERED.**

**Dated:    New York, New York**
**          August 9, 2014**        _____/s/_____
                                    **John G. Koeltl**
                             **United States District Judge**